Harmon. In the case of court, good morning, Your Honor. My name is Maurice Harmon. I'll go off on Harmon and Sideman. We represent Peter Murphy. Peter Murphy will explain it as well as he's involved here. I'd like to reserve six minutes, Senator Barlow. Very well. The rule 56F, denial by the lower court, creates the issues, the other issues that I've decided here, which are numerous, at least in the analysis. But briefly, essentially this case was filed in 2008 because of some personal matters on both sides, discovery. The only discovery that was propounded was initial written discovery, one round. Those responses were obtained. Thereafter, there was an attempt to settle the case in front of the magistrate judge. That failed. We then proceeded to, from a plaintiff's perspective, find additional discovery. We attempted to take depositions, even prior to the settlement discussions, we attempted to schedule depositions. Did you have a pre-trial order with specific schedule, including a date for a dispositive motion, did you? Yes, there was, and that was entered in September of 2008. There were attempts, following that, to schedule depositions. That initial discovery was propounded. Unfortunately, two personal tragedies occurred, and things got continued. We kind of got back on track in April, and in early May, we attempted to settle the case with a conference in front of the magistrate judge. Have you ever heard of the recording of the on-air tie raid? No, it was publicly requested within three days or so following the broadcast. You said it was destroyed, I guess, right? The claim of the radio station was that it was destroyed. But you got a transcript? No, there was no transcript. I thought a transcript had been presented or prepared. No, unfortunately not. The claim of the money radio group is that they were automatically destroyed. I am interested in this motion for discovery, and you were leading to that. Yes. So what happened? Well, here's what happened. During the conversations surrounding the settlement, especially when it became obvious that we were not going to sell it, it was thought that the resolution of two issues, one was whether CMI included the name of the author of the populated photograph here, Peter Murphy's name, and two, whether the defamation claim had been adequately fled, that the resolution of those two legal issues would facilitate resolution of the case. So the judge essentially concluded, as did the plaintiffs, that that might be helpful. However, so the decision was made that the motion would protect those two issues from being filed. But in the meantime, the plaintiff continued to press for discovery, because we saw no reason why discovery shouldn't be an option. Given that there were legal issues that had to be resolved, how was discovery going to help the court resolve those pending issues? It would not have. However, what happened is, despite that agreement, when the motion for summary judgment was filed, it was a motion for summary judgment on all of the issues, the defamation claims, not just the plea department, that there was insufficient evidence, well, actually, that there were no disputed material facts and no reasonable jury, that concluded otherwise that no defamation occurred. Every issue that we raised, including Fair News, which is a substantial inquiry and analysis that must be done, was briefed and requested to be analyzed and heard by the court. What's wrong with the judge saying, look, I'm going to accept everything you say in that complaint is true? I'm going to accept all of your associates, all of your pleas, it will be true. And then I will rule on whether you have a claim or not. The problem with that is that in this particular case, Your Honor, is that much of the fleshing out of the case, especially with respect to a defamation matter, especially with respect to a Fair News defense, would come in discovery and to limit a plaintiff's access to information, to their complaint, when that other information is only in the hands of the defendants, creates a handcuffing of the plaintiffs in a motion for summary judgment. Certain kinds of cases, that would be absolutely fine. But to be honest, you would have to factor into problems to assure that you could get consideration that you felt appropriate for a resolution, a motion for summary judgment, or have to be able to supplement with affidavits. The problem here is the radio station had almost all of the information related to Fair News and to defamation. You had scheduled depositions, but none were taken. We attempted to schedule depositions, but none were taken. Because of these other problems, you presented them to the judge. Yes, and there were some squirmishes about how it should be done. It was a defamation case without a transcript of the radio program. So is the plaintiff aggressive and residuous in pursuing the discovery request? Yes, Your Honor, and if you look at the record in that respect, I think you will agree. However, as soon as the motion for summary judgment was filed with all of these additional issues, the plaintiff almost immediately filed a motion under Rule 56-F to simply request discovery, just to put off our response until discovery could be conducted. I don't want to get you off your argument, but at some point maybe you can talk about the defamation claim, because it's somewhat novel. Well, yes, it is somewhat novel, and I guess the most interesting part of the defamation claim is whether calling a person or inferring that a person is a homosexual is defamation, defamatory. But our view is that that's really kind of a red herring, in the sense that calling someone a homosexual when they have a wife and three children, natural-born children, who have lived with that woman for 20 years and live in a small community of Clinton, New Jersey, and when you're calling them that over a radio station that is heard by a million listeners a day in that very location where you live... Regardless of the merits there, when you look at state law, as you know, for defamation, state law has spoken on the issue. Well, state law has not. What about the Grant case? How do you get around the Grant case? Right, well, the Grant case, though, was talking about Bob Grant, who probably all of us have heard of, at least, who was making remarks concerning a public figure, and the context here is that Mr. Murphy is a private person. In the Grant case, there was an ongoing feud between, apparently, the studio and, in this case, we have a private party, and the real difference is that those two radio DJs, Craig Carton and Ray Suglossi, had a personal view with Mr. Murphy that had nothing to do with any kind of on-air connection or any kind of comments about Murphy as a politician or an athlete or a public person. They simply used him as their radio show's bully to go after somebody in a one-sided way and tell people, don't do business with Mr. Murphy. But didn't the analysis really focus on, these are folks who are living on the radio and say shocking things? Isn't that this case as well? That was the analysis of the court, but I respectfully suggest that being a radio DJ and being known to be bombastic and caustic should not permit, in all circumstances, making false remarks about a private person who you're talking to mad at because you're not at the store and you thought you would somehow... Even if you knew that he would be defamatory to call a person who was homosexual, to call that person heterosexual? Well, it could be, Your Honor, if that person held themselves out to be a homosexual and they had lived that life and that was what their friends and family knew and that therefore you imply that they had lived a lie. Our culture hasn't gone beyond its being somehow insulting or defamatory to misrepresent someone's sexual identity. Well, I think that our culture has if it's simply a misrepresentation without the context of the family and of Mr. Murphy and his situation in this case. But it wouldn't be defamatory, Your Honor, on the New Jersey law to say that a person whose life had been lived as black was in fact white? Contributing whiteness to a person who was heterosexual and that was false? Perhaps if that person had represented themselves in a certain way and that the truth was that they were living a different life. In other words, it's not just a per se classification of someone that I think is defamatory. Your Honor, a misrepresentation that somebody was black when she was actually white would that be defamatory? Would it be, Your Honor? And if so, does that give us any guidance with respect to this issue? Well, under New Jersey law, the context of the remarks is critical. And here there wasn't even an opportunity to answer the question. It depends on the context and the setting and what the remarks were and how they were directed. And here we didn't even have an opportunity to conduct any discovery to even get to that point. And incidentally, New Jersey has not decided this issue. The appeals court has decided it and said in 2001, I believe it was, that it is defamatory to call a person homosexual. I was asking you about that. That was Gray v. Press in 2001. And the court said, although society has come a long way in recognizing a person's right to freely exercise his or her sexual preferences, unfortunately the fact remains that a number of citizens still look upon homosexuality with disfavor. And that was a ruling that said that those types of defamation claims may be presented in state court. I thought, if I remember correctly, that the district judge rejected that case. He did. And what was the reason for the rejection? The rejection was predicated upon the notion that since the New Jersey Supreme Court had not ruled on this issue, that he wasn't bound by the appellate court decision. That doesn't sound right. I mean, that can't be. If the Supreme Court has not ruled on an issue, you can consider the ruling of the highest appellate court of the state. And then the court, but in fairness, the court went on to say, because of some intervening things that happened in New Jersey, there was the enactment of some protections for homosexuals, and there was a different attitude about it. And so that predicted the district court. But that court did note that there has been a change in attitude. I understand it's still ruled that calling someone a homosexual is defamatory in the state of New Jersey. So to that, that should be followed. I'm sorry, I'd be happy to spend more time, as long as it doesn't... No, no, please answer your question. Judge Pollack has a question for you. I'm sorry. The court in Gray said it was, unfortunately, we haven't yet arrived at a state where distinctions of this kind would be non-pertinent in a defamatory sense. As in 2001, a lot has happened, and the district court pointed to some of what has happened, to attitudes which seem to bear on how the New Jersey Supreme Court might be likely to look at these issues now. Yes, that's correct. That's what the district court had said. But I respectfully submit that in order to do that properly, if the law is really going to be changed by a federal district judge, essentially in New Jersey, that there ought to be a full and complete record that you bring to the court in order to present that issue. And again, with respect, it seems that the state of New Jersey should decide that issue rather than a federal district judge sitting in that jurisdiction, since it's a state-law question. Okay. Mr. Harned, thank you very much for getting back on rebuttal. Mr. Korzenik? Good morning, Your Honors. David Korzenik, Miller Korzenik Summers, on behalf of Millennium Radio Group and Mr. Jourossi and the court. I note I got all dressed up today to discuss the copyright issues and to share the other issues with my co-counsel, Tom Packerty. But since the court and our counsel, the plaintiff's counsel, has begun with addressing the defamation issues, I will take my 10 minutes and maybe reduce it and allow Tom to speak first so that you can dovetail your questions to him. Who's discussing the discovery issue, the 56F issue? Well, in connection certainly with defamation, I'm very happy to discuss those quickly as to what we think of the right issue of the MCA. I appreciate you're doing that. We were just listening to Mr. Harned talk about the discovery. It sounds like the district court subjected this complaint to a summary judgment standard, exactly a higher standard. From the plaintiff in pleading, could you go over that issue and what happened with the discovery request? Yes, let me address it as to the copyright issues, which I most wish to amend. Tom will, I think, beat the other one. The DMCA issue is a straight question of law. I think we all agreed to that when we decided to go into the motion sequence. There's no question. No one contests what was copied, where the gutter credit was. We concede everything in the complaint as being true and we simply ask that the court rule that the DMCA does not apply to this set of repeated facts. But if we were to say the DMCA, correct me if I'm mistaken, does in fact apply, the response is that we have fair use of the photograph because we wanted to publicize the fact that we won this award. And some discovery would be appropriate on that issue. Let me discuss that. So I think DMCA is clearly right and was clearly conceived right, but for everyone, it's a pure question of law. On fair use, ever since the Ayka Feroz case, the nature of fair use litigation has been changed. It's been transformed. Souter adopted, voting 52 times, Judge LaValle's article in the Harvard Law Review about clarifying fair use standards and trying to make them more predictable and certain. And in doing that, what they did is they made this factor number one, the transformative use factor, the dominant consideration. As I noted in the brief, when making that factor, that transformative evaluation, the issue is whether the reader in Mrs. Souter's language reasonably perceives the transformative purpose in the work. So it's a reasonable man standard aimed at examining the work. It's not a question of looking at the purpose of the… How do you determine that? Do you have to look at the accompanying language? You simply look at the defendant's work and how they used it to determine whether there is a perceived transformative purpose to it. But there wasn't any transformative conduct or behavior in the original posting of the photograph as such, was there? Well, all fair uses involve replication of either a photograph or components of some written material. And the law is clear in the case of Feroz and elsewhere that it need not be altered by the parties. It simply has to be transformative in the sense that the purpose of the use by the defendant is different than the purpose of the use that was of the plaintiff. And here, normally, transformative uses are criticisms and commentary on the cited or appropriated work. In this case, it comes under the express news reporting exception or news reporting provision of the Fair Use Law, Section 107, which speaks of that possibility of using, in a transformative way, material for a news report. Now, in this case, it's not, and I'll say this, there's a very big difference here. If you take, I want to do a report on Haiti, and I see somebody else's news report about Haiti, and I take that photograph to do my report on Haiti, not fair, not fair use, not transformative use. In this case, it's rather unique and a little bit different. New Jersey Monthly is a magazine. It creates its own kind of news event, the Best of New Jersey, each year. And it issues awards to all of the best of New Jersey, the Best Shock Jogs, the Best Pizza, the Best Restaurant, and so on. Here, the radio station and the Shock Jogs, Barton and Rossi, took the picture with the emblem on it that said Best Shock Jogs and put it on their website to announce to their readers that they were winners of this award. Well, isn't that the same use? Isn't that exactly what the magazine did? It's different in the sense that we didn't use this to give an illustration of Barton and Rossi. We have many pictures of Barton and Rossi. The picture, if you'll see it in the record, is a picture with a burst on the side that says Best of Jersey. So in this sense, the work was proof of the datum, of the fact, of the artifact, of their winning. It's certification and proof that they were the winners. It's what we won. I understand that, but that seems exactly what the magazine did. Why isn't that the same use? It is the same photograph. So you gave the example of the misreporting in Haiti. It was the exact same... It's not in the same sense, Your Honor, because what we were doing here was trying to give proof and evidence of our winning. The New Jersey Monthly created a media event. It created its own news event by giving out these awards. When people participate in that kind of thing, as a photographer, they know that that event is a newsworthy event that everybody is going to be watching. And it is not inappropriate. And it is fair use, and it is transformative for the winner to take that picture with the certification of their being the best, to say, look, here is the datum, here is the artifact of our victory. I just think you're giving some skepticism about whether it's truly transformative or not. And I understand why, because the typical fair use, the normal fair use is one of criticism and comment. But 107 provides that news reporting is too. It actually provides it expressly. And my statement here is that this use of this victory picture, which has no utility otherwise with that emblazoned Best of Jersey and Starburst in the upper right-hand corner, is a perfect example of the appropriate news reporting use. Because that is the event itself. That picture is the award. That is the symbol of their victory. And they are entitled to tell their readers, we won this award. So you're not saying it's transformative because it's not a parody. It's news and it's news, I guess. It is the news itself. In other words, the picture is not just a picture of news. The picture is the news. That's what makes it transformative. How is that different from stealing a news report regarding something that happened in Haiti? It's very different because, keep in mind, Your Honors, all of these fair uses are ultimately infringements at the outset. You wouldn't even get the fair use analysis if it wasn't an infringement. What fair use is saying is that there are certain infringements that are going to be protected and not made the subject of liability. Now, I just want to go to the other factors as well so that we can see. The second most important factor is the fourth factor, which relates to whether there's any market impact. Now, as to discovery, the first factor is a reasonable land standard looking at the work itself. The fourth factor is whether there's any market impact on the plaintiff's business. Conceivably, in their papers, they concede that the 26 other photographs are fair use, with the mustaches and the transformations and so on. Those are clear comment and criticism. But the other factor four is about information and market impact that is purely in the hands of the plaintiff, not the defendant. And the failure to come forward or to provide information that they have about that market impact, they, in fact, concede that they have none, except that the only real use of this would be to us, and that's exactly the kind of damages that can't be included in the computation of market impact. The market impact is but one of several factors. It has to be fully... The other two factors, as Judge Pisano correctly noticed, was we're not dispositive and both of them are available on the face. You don't need discovery to find out what the quantum of use. We know what the picture is. Those are provided. The plaintiff's picture is in the complaint. The defendant's picture is in the complaint. So we know what percentage was used. Many fair use cases, such as the Phil Gramm Archive case, and many others use 100% of the photograph. That's usually how photographs are used, and those are still fair use. So all of the factors, I'll simply say, are factors that are manifest. They do not require discovery. And ever since A.F. Rose, fair use defenses are much more susceptible to early disposition than they should be because they engage...correlate with the First Amendment. I'm just going to ask you one. It's kind of a side issue. We seem to use the phrase gutter credit. Is that considered pejorative? I'm not familiar with that. No, it's not pejorative. Okay. It's just the way the public should speak. We're going to have to write on it. But I, if Your Honor, do wish, I'm eager to make one point about the DMCA. If I may be permitted to do so. Yes, go ahead. The DMCA issue cases on which the plaintiff relies that don't follow on cue or textile secrets of the other cases that follow Judge Greenaway's thoughtful analysis of the statute. They all do two things. First, they look at a sub-subsection of this statute with blinders on, squinting myopically as the Third Circuit discriminately notes. And they look only at that to discern the quote plain meaning. And they go further to say that they do not have to. They are entitled to ignore, not just legislative intent, but treaty language which was expressly ratified and approved by Congress that makes clear that Judge Greenaway's reading of this statute was correct. The copyright offices summary of this that basically endorses the very same functional analysis that calls for an hour reading of the DMCA 1202 Bonneville case. And the Third Circuit says you take that stuff, this court will take it. We can't literally go to the extrinsic type information like legislative history and other interpretations, right? Don't we go to the text first? You go to the text in the first instance, but there's no rule that you may not consider legislative intent. But I'm not even asking that the court look at committee reports. It should, and it can, and as Judge Patrick, Professor Patrick notes, in a thousand cases where it's almost always in copyright cases, look at the legislative history. But I'm not even asking that here. I'm asking the court to look at treaty language that was actually adopted and filed by Congress. I'm asking the court to look at the structure of the DMCA and to look, for example, and this is one point that's not my brief, and this I'll do in two minutes. If you're honest with me, please examine section 1202B, 1202C. It lists those eight factors that courts, among them the author's information and so on. Let's say that you were an editor and you want to use a section from a book. That book will include an ISBN number, a whole set of other information. If you read these things narrowly with blinders on any one section, you'll come up with absurd results that show us that this statute should not and cannot possibly be read in this way. For example, if you look at a short, I'll make it quickly, section 7, include identifying numbers or symbols on all magazines, on all books, there's an ISBN number or ISSN number. If you read this literally and you want to make sure it uses somebody's book, you have to include the ISBN number. That's the same kind of straight blinders on logic that the plaintiff's argument or the Morrell case or the others follow, and I would ask and recommend that the court avoid those things. They call for terms and conditions of the use of the work. There's an agreement that the use of this, there's no reason that that should be included in order to inoculate yourself against an infringement. Very helpful point, Mr. Korsnick. Thank you very much. Thank you very much. Mr. Cafferty. Good morning, Your Honors. May it please the court. As Mr. Korsnick indicated, I am going to address the defamation issues. In this case, the district court judge dismissed the defamation count for two reasons. Number one, adopting the context and content of the statement as alleged by the plaintiff in his own complaint, the district court found that they were not capable of defamatory meaning or were not actionable because they were rhetorical, hyperbole, epithets, or name calling. Secondly, with respect to the issue of fees. But let me stop you there because there was an apparent division decision. Now, I understand that he said, I'm not bound by it because it's not the New Jersey Supreme Court. And maybe he also said that it was a while ago. But you still have a ruling of a state court, the highest appellate court in New Jersey. Isn't the court bound to apply state law? I believe that the court is bound to apply controlling state law. And I believe as a practical matter, in light of the changes, in light of the Supreme Court decision, in the great Lewis v. Harris case, in light of the domestic case. Well, why should you grieve for that? I mean, you have an opinion. It's an interpretation of the Equal Protection Clause. It doesn't really say anything about sort of prevailing views in New Jersey. At the end of the day, I think the court, because the issue of whether, and now we're talking about the allegation, whether the allegation that they inferred he was a homosexual. And before I lose that, I want to make a comment on Mr. Harmon's argument. That context, because he's really changing the case. The complaint in this matter alleged that they inferred he was a homosexual. And I heard him in oral argument say, and, you know, that's a red herring, Your Honors, he said. It's a red herring because, in addition to that, he was married and he had children. If he is now arguing that there is an innuendo as a result, that calling someone homosexual is not defamatory, but that there are extrinsic facts, that if you know those extrinsic facts, that non-defamatory statement becomes defamatory. Mary Smith had a baby, not defamatory on its face. But maybe there are extrinsic facts that she was unmarried, she was a minor, what have you. Under New Jersey law, you must plead the inducement, those extrinsic facts. That was not done here. That is not simply the case that Mr. Harmon presented to the district court. With respect to the issue of whether calling someone or inferring someone is a homosexual is defamatory, at the end of the day, I think that courts, because it is a question of law, whether it's capable of a defamatory meaning. And I think the simple way to say this, courts are not required to accept social prejudices as they find them. There may be segments of the community today that would view it defamatory, say someone is an African-American. That isn't the test. The test is, under New Jersey law, whether right-thinking people will think less of you as a result of the allegation. And I think the district... See, I may agree with you 100%. I can't say that I do or that I don't. But I'm not sure that that's the question. As opposed to, should a federal judge addressing state law accept the law as stated by the highest appellate court of the state? Or can the judge say, well, I just don't happen to agree with it, so I'm going to ignore it? I mean, I think that's a question that we have to address. I think there's two... Without getting to the merits, I mean, you disagree with it, but I don't know if we can just ignore it. I believe, ultimately, the function of the district court applying New Jersey law, and the function of this court, is to predict what the New Jersey Supreme Court, the highest court, would hold on that issue. I think that's right if there is no pronouncement from any court. But you have one. So what are you going to predict? That the New Jersey Supreme Court is going to reverse the appellate court? In my opinion, yes, that is exactly what Judge Lozano did, Your Honor. He predicted that if the matter was presented to the New Jersey Supreme Court in 2010, when he made that decision, the New Jersey Supreme Court would not so hold. Of course, there is another vehicle. I don't, again, think it's required here, but this court could, of course, certify the question to the New Jersey Supreme Court. As I understand it. I'm sure they'd be very happy to get to this point. Let me ask you a question. Assume that we follow the Gray case, the appellate division case. I mean, does the Bob Gray case, the Wilson v. Gray case, does that help you? In the sense that, you know, is this all, even if that would be actionable under, you know, calling somebody homosexual, it would be actionable under the Gray case. The Bob Gray case could be considered hyperbole. Exactly, Your Honor. That's why I indicated at the outset that the court dismissed this on two distinct bases. And even if one were to say, one were to say, saying someone, inferring someone is a homosexual, based on the Gray v. Press Communications case, is capable of a defamatory meaning. It's still not actionable because it's rhetorical hyperbole. Mr. Gafferty, in the context of this show, as alleged by, and the plaintiff himself alleged the context and content in his complaint, describing his provocative and caustic remarks, he attached as part of his complaint as an exhibit, and therefore, probably before the court on the summer judgment motion, the New Jersey monthly description of the show. Mr. Gafferty, you want to finish up? Yes, Your Honor. And that New Jersey monthly description of the show talked about they're often obnoxious and boorish. And clearly, even if it is capable of a defamatory meaning, it's still not actionable because it's rhetorical hyperbole, opinion, epithet. Thank you, Your Honor. Thank you very much. Mr. Harmon, we gave you a higher service over the lecture time. You've taken two or three minutes, if you wish. Well, I deserve six minutes, Your Honor. All right. I'll try to do it as quickly. Eight. I'll try to do it as quickly as I can. Unless you finish, too. Yes. Your Honor, a couple of things quickly. The homosexual aspect, the calling someone a homosexual aspect of defamation, is only one part of what happened here. There's also these other statements that don't do business with Mr. Murphy because if you do, he's going to sue you, and they urge people not to do business. You really think that's defamatory? It sounds more like hyperbole than defamatory statement. I believe it goes right to the heart of classic defamation. You mean if you say publicly, don't do business with Mr. Murphy because he's a bad person, he just might sue you, you think that's defamatory? Well, I disagree with all respect. If you impugn a person's business reputation, that is a classic kind of defamation, and if you say as a regular DJ that if you do business with this guy, you name him, he will sue you, but it's not true. He's never sued his employers or people he's done business with. Okay, so he used the word might. Pardon? He said might sue you. Well, we don't really know, Your Honor. Here's the problem. We don't really know what happened. We haven't even been able to take the deposition of Craig Carton and Ray Rossi to find out, or anybody who was there in the studio at the time, which is what we tried to do. It seems fundamentally unfair in a case like this where that evidence is not available through some action of the plaintiff, some ability of the plaintiff, to say we're going to make a decision on this on summary judgment before we get discovered, before we get a deposition. That's why I said in the beginning, the Rule 56 issue kind of permeates all the other issues and colors. What is extra discovery going to get you in the defamation case? It's going to... What do you hope to get? We hope to get the exact words that were stated. We hope to get information about how long this diatribe went on. Do you doubt that there's... Are you suggesting that there's some transcript of recording of this out there that they're not turning over? No, although it seemed odd, because these DJs, one of whom went on to a New York market, they pull extracts from some of the broadcasts. They kind of put together a portfolio. So it seems odd that three days later everything's going to be erased from the show. But this is a two-hour show, 45 minutes or so, from one of the witnesses that was on the plaintiff's side, indicated that this went on for 45 minutes, that we would get the details of it to the best of the knowledge of Carton and Rossi, who were there, and the engineer that was there at the time. And I think we're entitled to that under law, under who made an application. Even Judge Casano said that. So how we cannot go on to be permitted to get the discovery seems to me to be a big problem for the appellees. With regard to fair use, Campbell v. Acoff-Rose simply stated that you cannot presume in a fair use analysis that a commercial use is transformative. Campbell-Rose, with respect to my opponent, does not say that the first factor is the most important or that the fourth is the most important. He says, actually, you analyze transformative use, but you also analyze the other three statutory factors. And at the end of that analysis, you decide whether fair use is favored or it's not, whether the fair use favors the position of the defendant or not. Well, you heard Mr. Korsenik's argument. Why was this not fair use? It's not fair use because, first and foremost, it was not transformative. And Mr. Korsenik says in Walz and in his brief that... Do you need discovery on this issue? Probably not on this issue. What we need is a reversal of the decision because it's erroneous that you can take a photograph fully and just... It's always going to be a different use. Literally, you're always going to take it over here and use it for something else. That's not what fair use provides. Fair use requires, and the court in ACUF says, fair use must ask whether, one, there is something that this use adds that's new. Two, with a further purpose or different character. A further purpose or different character, not another purpose. And three, altering the first use, or the first, the original, with a new expression meaning or message. And that's just to determine whether it's transformative. In other words, and the court says this in ACUF, 510 U.S. 5379. In other words, whether and to what extent the new work is transformative. The court doesn't transform it. It was literally taken from the New Jersey Monthly project and then put on websites without permission to do the very same thing. The CMI issue, I think, is really clear, and it's most telling that in the defendant's brief, they didn't even quote the language of Pablo Coup. It says, CMI means the name of the author. Do you ever think Congress intended to sweep in so much? It seems that it's just an open door to take sort of garden variety copyright cases and then be able to make an actionable under the DCMA. I think that what Congress intended is something that, as we all know, can be gleaned from various sources to make an argument on both sides of almost any issue, many times. My best argument is the pure text, but I think there are other things that would go the other way. I think that we don't even have to get to the legislative history because the text is so clear. If this text isn't clear enough to warrant a ruling without looking at legislative history, then probably almost no text could be. If the law says, if the statute says what it says, it's up to Congress to fix it later if they think this went too far. If this is very clear, it's what the Aljeanse-France bus case just said 14 hours, four days ago, I guess a little more than that, when the judge in, Judge Polly in the SDNY rejected this case, cited this case, Berkeley versus Millennium, and its embrace of the IQ case and said, it's just wrong, and it does not provide a proper analysis of this statute, which is clear on its face. Thank you, Mr. Hyman. Thank you very much. Very good arguments. May I speak to you for a moment? Up here.